STEVE ELZINGA, OSB #123102
Marion County Counsel
selzinga@co.marion.or.us
555 Court Street N.E., Suite 5242
P.O. Box 14500
Salem, OR 97309
Telephone: (503) 588-5220
*Of Attorneys for Marion County*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **MARION COUNTY,** a Political Subdivision of the State of Oregon;<br><br>        Plaintiff,<br> v.<br><br>**TINA KOTEK,** in her capacity as Governor of Oregon;<br><br>**KRISTI NOEM**, in her official capacity as Director of the United State Homeland Security; and<br><br>**TODD LYONS,** in his official capacity as Acting Director of the United States Immigration and Customs Enforcement,<br><br>        Defendants. | Case No. 6:25-cv-01464<br><br>**MARION COUNTY'S RESPONSE TO STATE DEFENDANTS' MOTION TO DISMISS** |

**Introduction and Background**

1. **All Oregon local governments face legal uncertainty in how to respond to federal immigration subpoenas. This affects federal and state funding, plus risks liability.**

Counties are constitutionally required to follow both federal laws and state laws. Counties receive significant funding from both the federal and state governments for essential services like roads and health care. There are liability risks if counties inadvertently act inconsistently with either federal or state law. This litigation seeks to clarify legal requirements to allow Marion County to follow the law, preserve funding, and avoid liability.

The Oregon State Sheriffs' Association and 34 of 36 Oregon Sheriffs agreed "that there is a good deal of legal uncertainty" that needs to be resolved by a court decision "in light of the apparent conflicts between the Oregon Sanctuary Promise Act, Oregon Public Records Act, and federal law." *Declaration of Steve Elzinga in Support of Marion County's Response to State Defendants' Motion to Dismiss* ("Elzinga Decl."), ¶5, Ex. 1.

Similarly, 20 of Oregon's 36 counties agreed that it "is currently unclear how Oregon's Sanctuary Promise Act, Oregon's Public Records Act, and federal laws interact and apply due to apparent conflicts, including in situations where a local government is served with an administrative subpoena pursuant to 8 USC §1225." Elzinga Decl, ¶5, Ex. 3. They sought "clarity that will help all local governments ensure they are properly following federal, state, and local laws." *Id.*

This Court recently clarified some legal questions in *United States of America v. Multnomah County Department of Community Justice, et. al*, case no. 6:25-cv-01794-MC, Opinion and Order, (D. Or. Nov. 24, 2025). However, important legal questions remain. For example, that decision specifically did not clarify the interaction of federal subpoenas with state public records laws. Amidst an uncertain legal landscape, Marion County recognizes that people of good faith may reach different conclusions as they evaluate the narrow legal interpretation questions raised in this case.

The state's motion interprets the law in a manner that protects violent criminals by making it harder for counties to provide public records to federal agencies in all immigration investigations without exception—even for public records of violent criminals when those very same records can undisputedly be provided to the media and the general public. Marion County now finds itself stuck between the federal and state governments.

2. **Marion County takes a middle-ground position.**

Marion County welcomes immigrants seeking a better life for themselves and their families. Marion County supports and serves immigrants who work hard, participate in the local community, and try to follow the rules.

Marion County prosecutes anyone who commits violent crimes, regardless of immigration status. To protect all community members, including immigrants, Marion County supports deporting convicted rapists and kidnappers who have victimized children, violated immigration laws, and are taking up taxpayer resources.

Marion County seeks to follow both state and federal laws.

3. **The history of Oregon's sanctuary laws is more nuanced than the state's summary.**

For 30 years—from enactment in 1987 until significantly updated in 2017—Oregon's sanctuary law (now in ORS 181A.820) only prohibited state and local law enforcement agencies from using "agency moneys, equipment or personnel for the purpose of *detecting or apprehending* persons whose only violation of law is that they are persons of foreign citizenship residing in the United States in violation of federal immigration laws." Oregon Laws 1987 c.467 §1 (emphasis added). Even then there were several exceptions, such as to "verify the immigration status of a person if the person is arrested for any criminal offense." *Id.* The law was unchanged until 2003, when another exception was added allowing state and local law enforcement to arrest persons charged with criminal violations of immigration laws pursuant to "a warrant of arrest issued by a federal magistrate." Oregon Laws 2003 c.571 §1.[1] Otherwise, Oregon's sanctuary law remained unchanged until 2017.

Oregon voters upheld this version of Oregon's sanctuary law in 2018 when 63% voted

---

[1] https://www.oregonlegislature.gov/bills_laws/lawsstatutes/2003orLaw0571ses.html

Page 3 of 13 – MARION COUNTY'S RESPONSE TO STATE DEFENDANTS' MOTION TO DISMISS

against a repeal effort (Measure 105).[2] Oregon voters upheld a version of the sanctuary law under which many local governments routinely provided information or criminal records to the federal government through informal arrangements or via public records requests.

After later additions created ambiguity by leaving earlier provisions in place, the Ninth Circuit held that, because multiple provisions in the current law had savings clauses allowing compliance with other state and federal laws, these savings clauses allowed sharing information with the federal government for immigration purposes in some circumstances. *City & Cty. of S.F. v. Garland*, 42 F.4th 1078, 1085-86, n.8 (9th Cir. 2022).

## FACTS AND PROCEDURAL HISTORY

On August 1, 2025, federal agents with the United States Department of Homeland Security, Immigrations and Customs Enforcement Division, served Marion County with immigration enforcement subpoenas seeking records related to five named individuals by August 18, 2025. Complaint at ¶ 10. Four of the subpoenas (the "federal subpoenas") requested records of individuals convicted of serious crimes. *Id.* at ¶¶ 11-14. The fifth subpoena concerned a named individual whose identity was unclear to Marion County at that time, *Id.* at ¶ 15, and the United States later said it was withdrawing that subpoena as well as one other. Elzinga Decl, ¶3.

Similar subpoenas were served on Clackamas, Multnomah, and Washington Counties, each of whom declined to provide responsive records. Instead of agreeing or declining to provide responsive records, Marion County gathered responsive records and filed this action seeking to clarify its legal obligations. Most sheriffs and counties agreed with Marion County that legal clarity was needed. Elzinga Decl, ¶¶ 5, 11.

---

[2] Oregon Secretary of State, November 6, 2018, General Election Abstract of Votes, p. 34, available at https://records.sos.state.or.us/ORSOSWebDrawer/Recordhtml/6873825. This vote did not include 2017, 2019, or 2021 changes. *Compare* Oregon Secretary of State, *Voters' Pamphlet Oregon General Election November 6, 2018*, available at https://digitalcollections.library.oregon.gov/nodes/view/24725 (see page 103 for text of measure) *with* Oregon Laws 2017 c.724; Oregon Laws 2019 c.13; and Oregon Laws 2025 c.87.

When the state delayed efforts to obtain legal clarity in this case, the United States filed a separate legal action to enforce subpoenas against all four counties. *United States of America v. Multnomah County Department of Community Justice, et. al*, case no. 6:25-cv-01794-MC. Even though Marion County quickly responded by asking the Court for an order to provide the responsive records, Marion County was still forced to spend county resources in that case. Elzinga Decl, ¶9. The Court ultimately issued an order directing all four counties to provide responsive records, including three subpoenas to Marion County. Marion County immediately provided responsive records for the three subpoenas to the federal government pursuant to this Court's order. *Id.* at ¶12. Notably, all of the provided records (plus other related records not provided to the federal government) had previously been provided to three media entities who had requested them under Oregon's public records laws. *Id.*

On January 22, 2026, federal agents with the United States Department of Homeland Security, Immigrations and Customs Enforcement Division, served Marion County with a new immigration enforcement subpoena, this time seeking records related to nineteen named individuals by February 13, 2026.[3] Elzinga Decl, ¶13, Ex. 4. Once again, instead of agreeing or declining to provide responsive records, Marion County is gathering responsive records and seeks to clarify its legal obligations through this action. Elzinga Decl, ¶14. Once again, most of the named individuals are currently on parole after having been convicted of violent and serious crimes, such as rape, kidnapping, sodomy, sex abuse, using a child in a display of sexually explicit conduct, strangulation, unlawful use of a weapon, and attempted murder. *Id.* at ¶15. Once again, the records responsive to this federal subpoena are public records that Marion County would normally provide to any person who asks under Oregon's Public Records law.

---

[3] For efficiency purposes, Marion County intends to amend its complaint to include this new subpoena after the Court resolves the State's pending motion, unless the Court directs an amendment to occur sooner.

The new January 22 subpoena included one of the same named individuals from the August 1 subpoenas that had been previously withdrawn. *Id.* at ¶16. Records responsive to that overlapping subpoena were not part of the Court's prior order and remain subject to the outcome of this case. *Id.*

## ARGUMENT

Marion County responds in turn to the three arguments in the state's motion regarding (1) the injury-in-fact requirement for standing, (2) municipal authority, and (3) supplemental jurisdiction.

1. **Marion County has standing to seek legal clarification due to the ongoing costs of responding to federal government subpoenas, among other things.**

Marion County's standing and injuries pled in the complaint are not merely hypothetical. Some costs have already occurred, such as when the federal government sued Marion County to enforce the August 1 subpoenas. Complaint, ¶80; Elzinga Decl, ¶9. Now, the federal government has served a new subpoena that will result in more costs to Marion County. Elzinga Decl, ¶¶13, 17. There is every reason to believe the more subpoenas will be served in the future. These facts alone are sufficient for standing.

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.' For there to be a case or controversy under Article III, the plaintiff must have '"personal stake"' in the case – in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)). Marion County has met that test. The Complaint pleads that Marion County's compliance with whichever law is deemed controlling is compelled, and deviation risks

penalties. Complaint, ¶¶ 80-92. In addition to already accrued costs, Marion County has imminent risk of losing federal funds and/or facing contempt proceedings if it disobeys federal laws and faces imminent risk of liability if it violates state laws. *Id.*

Here, Marion County's threatened harm is neither hypothetical nor remote. In *Susan B. Anthony List v. Driehaus*, it was held "that a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). The facts here are similar. Marion County has no mere "hypothetical" fear – multiple rounds of ICE subpoenas have been issued, and the U.S. Attorney has both taken and threatened enforcement action. The letter from United States Attorney General Bondi states that the federal government is currently evaluating "their statutory authority to issue grants, contracts, and federal funds, to determine where immigration-related terms and conditions may be added to combat sanctuary policies that violate federal immigration law." Complaint, ¶8. Her letter also states, "designation as a sanctuary jurisdiction may result in additional consequences and further agency actions pas permitted by law." *Id.* This is an imminent risk of a concrete sanction.

Unlike in *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), which the state cites, the future harm here is far from hypothetical or self-inflicted. Federal law (8 U.S.C. §1225(d)(4)) envisions exactly this scenario: ICE issues a subpoena, and if a public body declines, ICE can seek enforcement via a court order and then contempt. Marion County has already been sucked in to this process. Furthermore, the Supreme Court has held that "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat. . . . The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not

eliminate Article III jurisdiction." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) (emphasis in original); *see also*, *Terrace v. Thompson*, 263 U.S. 197 (1923); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926); *Ex parte Young*, 209 U.S. 123 (1908).

In *Steffel v. Thompson*, then-Justice Rehnquist in his concurrence stated "the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity." 415 U.S. 452, 480 (1974). "[P]utting the challenger to the choice between abandoning his rights or risking prosecution – is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" *MedImmune, Inc.*, 549 U.S. at 129 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 152 (1967)). A party choosing not to violate the law does "not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced." *MedImmune*, 549 U.S. at 129. The Supreme Court recently held that "with respect to the concrete-harm requirement in particular, this Court's opinion in *Spokeo v. Robins* indicated that courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). "Various intangible harms can also be concrete. . . . for example, reputational harms." *TransUnion*, 594 U.S. at 425 (citing *Meese v. Keene*, 481 U.S. 465, 473 (1987)).

"We have held that an organization that suffers a decreased 'amount of business' and 'lost revenues' due to a government policy 'easily satisf[ies] the "injury in fact" standing requirement.'" *E. Bat Sanctuary Covenant v. Trump*, 932 F.3d 742, 767 (9th Cir. 2018) (quoting *Constr. Indus. Ass'n of Sonoma Cty. V. City of Petaluma*, 522 F.2d 897, 903 (9th Cir. 1975); *cf City & Cty. Of S.F. v. Trump*, 897 F.3d 1225, 1236 (9th Cir. 2018) (holding that "a likely 'loss of funds promised under federal law'" satisfies Article III's standing requirement (quoting *Organized Vill. Of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015))).

The Injury-in-Fact requirement thus is satisfied: Marion County alleges (and has already suffered) a concrete injury arising from a present choice, not a generalized grievance. Complaint, ¶¶ 80-92. This satisfies the first element of *Lujan*. The State's contrary argument (that Marion County can simply pick one side and be safe) ignores Marion County's realistic fears of enforcement or funding loss. At the pleading stage, these allegations suffice.

Further, although it is premature to offer arguments on the proper construction of Oregon and federal laws at this stage—a question that is not currently presented by the state's motion to dismiss—how the law is interpreted will also change what sorts of costs Marion County faces in the future. This includes legal compliance, staff time, and the prospect of lost funding or liability. Complaint, ¶¶ 80-92. For example, the interpretation of what the law requires regarding the timeframe of *when* Marion County can respond to subpoenas—i.e. either quickly based on a subpoena or more slowly only after declining to provide records and then being sued and ordered to provide records—also impacts the timing of when the federal government is able to utilize the information to detain convicted criminals on parole, and that timing directly impacts money and staff time spent by Marion County on parole supervision of those convicted criminals.[4] Complaint ¶ 89.

Notably, the state is unable to support a contrary legal standard. For example, the state argues that "Litigation costs are insufficient to establish Article III standing" and quotes three cases for the proposition. However, all three cases actually support Marion County's standing in the present situation.

First, the state quotes *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) for the proposition that "Obviously … a plaintiff cannot achieve standing to litigate a substantive

---

[4] This sort of second-degree monetary impact is sufficient for standing. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 113-14, 145 S. Ct. 2121, 2135 (2025).

issue by bringing suit for the cost of bringing suit." However, reading further, the Court said that "investigation costs" incurred prior to the litigation "would assuredly support Article III standing." *Id.* at 108.

Second, the state quotes *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) as saying "standing must be established independent of the lawsuit filed by the plaintiff." However, reading right before that statement, the Court recognized that there is sufficient injury in fact if a statute "frustrates the organization's goals and requires the organization 'to expend resources in representing clients they otherwise would spend in other ways.'" *Id.*

Third, the state quotes *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) for the proposition that an organization "cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." However, once again the statement is taken out of context. The Court there recognized that standing is available when suffering a diversion of resources that is involuntary. *Id.* That is true here. Marion County is not manufacturing standing. Marion County is forced to respond to federal subpoenas in some manner. This creates costs and diverts resources.[5] This situation meets the quintessential requirements of an injury in fact that is concrete, particularized, and actual or imminent.

---

[5] "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) (citing *McGowan v. Maryland*, 366 U.S. 420, 430-431 (1961)). Even "one dollar" of impact is enough for standing redressability and thus also for standing injury. *See Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114, 145 S. Ct. 2121, 2135 (2025) (citing *Uzuegbunam v. Preczewski*, 592 U. S. 279, 292, 141 S. Ct. 792, 209 L. Ed. 2d 94 (2021)).

2. **The state's motion fundamentally misunderstands Marion County's position on the Supremacy Clause.**

The complaint in this case does not allege that any Oregon law is unconstitutional under the Supremacy Clause. It merely recognizes that the federal government may argue such unconstitutionality and seeks clarity. Those are two different things. Marion County's position is not prohibited by the cases cited by the state.

More importantly, Marion County's complaint alleges that "Marion County is uncertain what the law requires but believes the law likely allows, but does not require, Marion County to provide responsive records." Complaint, ¶ 74. While Marion County acknowledges it may have overlooked something, the only way Marion County currently believes the law could be interpreted to *allow-but-not-require* Marion County to provide responsive records as alleged in Complaint ¶ 74 would be if (1) Oregon laws are interpreted to *allow* Marion County to provide responsive records,[6] and (2) those state laws are not preempted by federal laws because either (a) federal laws are interpreted *not to require* providing records or (b) federal laws are interpreted to require providing records but *not to preempt* conflicting state laws that *allow-but-not-require* providing records. Thus, Marion County's complaint does not allege that any Oregon law violates the supremacy clause, although Marion County's complaint does acknowledge that the federal government may argue that, and if so, Marion County desires legal clarity on that point. At this point it is unclear what exactly the federal government will argue, but if the federal government does not argue preemption, then Marion County will not do so either.[7]

---

[6] Such as if the interaction of public records laws and the sanctuary law's allowance to provide information about criminals in jail or on probation/parole to the federal government for immigration purposes "[t]o the extent that the information is available to the general public and under the same terms and conditions as the information is available to the general public." ORS 181A.823(1)(c)(B). There are other possible law interactions that could result in a similar outcome.

[7] Even if the Court disagrees with Marion County's arguments on this point, the state only argues on this point that Marion County "lacks standing to seek a declaratory judgment regarding preemption, commandeering, and the Supremacy Clause." Motion at 19. Even if the state were right, only the part of Marion County's first claim for relief

    3. **The Court has supplemental jurisdiction for a declaratory judgment resolving outstanding uncertainty regarding the interaction of Oregon's sanctuary and public records laws.**

Under 28 U.S.C. 1367 (a), this Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." The state's primary argument is that "[i]f the Court dismissed Plaintiff's claims related to the Supremacy Clause, only state law claims would survive." Motion at 21. However, that is not correct. This case concerns 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231. Complaint ¶ 30.

Bother state and federal law are intertwined here. For example, the savings clauses in ORS 180.805(2) and (3) necessarily require interpretation of both state and federal law because they are worded "[e]xcept as required by state or federal law . . ." The savings clauses in ORS 181A.823(1)(a) is identical: "[e]xcept as required by state or federal law . . ." There is no way to interpret state and federal law separately, and it makes no sense to interpret one part of the sanctuary law divorced from the full context of the sanctuary law. Either a state court must interpret the interaction of state and federal law or a federal court must interpret the interaction of state and federal law.

Most Oregon counties and sheriffs have agreed with Marion County's request that this Court resolve the uncertainty regarding the interaction of Oregon sanctuary and public records laws for the benefit of everyone.

Although the state asks the Court to decline jurisdiction, the main premise of its request requires interpreting the very laws it asks the Court not to interpret. Marion County asks the Court to allow full briefing on this issue and, after consideration of such briefing, provide clarity

---

dealing with those issues should be dismissed and Marion County should have the opportunity to submit an amended complaint.

that will benefit all local governments. Marion County believes this Court is best situated to make a timely, well-reasoned decision and respectfully requests that the Court exercise supplemental jurisdiction.[8]

## CONCLUSION

Marion County asks the Court to deny the State's motion to dismiss in its entirety.

Dated this 13th day of February, 2026

/s/ Steve Elzinga
_____
STEVE ELZINGA, OSB #123102
Of Attorneys for Marion County
555 Court Street NE, Suite 5242
P.O. Box 14500
Salem, OR 97309
Telephone: (503) 588-5220
E-Mail: selzinga@co.marion.or.us

---

[8] If Marion County sued federal defendants in state court regarding immigration subpoenas, the federal defendants may be able to remove the case from state court under 28 U.S.C. § 1442, causing further delay.